USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/23/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
 :
IPAYMENT, INC.,                                                         :
                                                                        :
                         Petitioner,                   :   15-CV-1904 (JMF)
                                                                        :
            -v-                                             :   OPINION AND ORDER
                                                                        :
1st AMERICARD, INC., et al.,                             :
                                                                        :
                         Respondents.                :
                                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Petitioner iPayment, Inc. filed this suit to confirm an arbitration award. In a prior opinion, District Judge Analisa Torres, to whom the case was previously assigned, confirmed the award against Respondent 1st Americard, Inc. *See iPayment, Inc. v. 1st Americard, Inc.*, No. 15-CV-1904 (AT), 2016 WL 1544736, at *5 (S.D.N.Y. Mar. 25, 2016). (Docket No. 26). With the benefit of supplemental briefing, iPayment now seeks to confirm the award against two additional Respondents: Kelly Grainger, the former President and sole shareholder of 1st Americard; and Kelly Grainger, as Administrator of the Estate of Greg Grainger, the former Chief Executive Officer of 1st Americard. Whether the award should be confirmed against the Graingers turns on whether the corporate veil should be pierced, as neither Grainger was a signatory to the agreements at issue. For the reasons stated below, the Court concludes that this is a textbook case for application of veil piercing and thus confirms the award in its entirety and denies Respondents' motion to vacate the award as to the Graingers. Additionally, the Court grants iPayment's unopposed application for attorney's fees.

## THE RECORD

As a threshold matter, the parties dispute what materials the Court can look to in deciding whether to confirm the award against the Graingers. In its prior Opinion, the Court noted that it "must consider the issue of the Graingers' alter ego liability *de novo,* and approach the question as if it were raised on a motion for summary judgment." *iPayment*, 2016 WL 1544736, at *5; *see also Kaplan v. First Options of Chi., Inc.,* 19 F.3d 1503, 1520 (3d Cir. 1994) (holding that a court is not bound by an arbitrator's determination of alter ego liability and should review the question *de novo*), *aff'd,* 514 U.S. 938 (1994). Seizing on Judge Torres's reference to *de novo* review, Respondents contend that the Court's review should be limited to the record before the arbitrator. (Docket No. 39 ("Resp't Opp'n") 4). By contrast, emphasizing the reference to summary judgment, iPayment contends that the Court can and should consider additional evidence, namely written discovery and deposition testimony obtained through post-arbitration litigation currently pending in North Carolina. (Docket No. 36 ("Pet'r Mem.") 55-59).

iPayment has the better of the argument. For one thing, Respondents' position is ironic — and hard to credit — as they themselves submit and rely on supplemental evidence. (*See* Docket No. 42 ("Heater Decl.")). For another, the only case cited by Respondents that is even marginally on point, *Kaplan v. First Options of Chicago, Inc.*, cuts the other way, as the district court in that case provided the parties with an opportunity to submit additional post-arbitration evidence in connection with its veil-piercing analysis. 19 F.3d at 1520 n.26. And on top of that, most of the disputed evidence concerns the time period *before* the arbitration. (*See, e.g.*, Docket No. 37 ("Second Dahill Decl.") Ex. 5 ("Grainger NC Hearing Tr.") 114 (Kelly Grainger testifying for the first time, post-arbitration, that Greg Grainger had begun "withdrawing" from his responsibilities at 1st Americard six months before the transaction with iPayment)).

Respondents almost certainly withheld such evidence during the arbitration proceedings, and should not be rewarded now by disregarding any such evidence that is admissible. *Cf. Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 134-35 (2d Cir. 2001) (noting that a district court reviewing an ERISA eligibility determination *de novo* has discretion to consider additional evidence outside the administrative record if there is "good cause" to do so).

      Perhaps recognizing the dearth of authority supporting their argument, Respondents seize upon Judge Torres's use of the term "*de novo*" to argue that this proceeding is akin to an appeal and thus should be limited to the original record. (Resp't Opp'n 5-6). The question of whether the Graingers are bound by the arbitration award, however, turns on a question of arbitrability — namely, whether they were bound by the arbitration agreements between the two companies even though they themselves were not signatories to those agreements. *See, e.g.*, *Trina Solar US, Inc. v. JRC-Servs. LLC*, No. 16-CV-2869 (VEC), 2017 WL 187476, at *4 (S.D.N.Y. Jan. 17, 2017) ("Given that there has been no clear and unmistakable showing that the parties agreed to arbitrate arbitrability, the Court reviews *de novo* the Tribunal's decision that [the respondent] was bound by the arbitration agreement although not a signatory to it." (internal quotation marks omitted)); *iPayment*, 2016 WL 1544736, at *5 (citing *Nat'l Ass'n of Broad. Emps. & Technicians v. Am. Broad. Co.*, 140 F.3d 459, 462 (2d Cir. 1998). And the law is clear that such questions are to be decided using the summary judgment standard, with trial — and thus the possibility of new evidence — if there is a dispute of material fact. *See, e.g.*, *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011); *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). It follows that the Court can and should consider any admissible evidence presented by the parties and that "*de novo* review" in this context means simply review without the deference traditionally given to the decision of an arbitrator on the

3

merits.  *See Kaplan*, 19 F.3d at 1520; *iPayment*, 2016 WL 1544736, at *5; *cf. Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168 (2d Cir. 2001) ("*De novo* review is review without deference. . . . [O]ur review is independent and plenary; as the Latin term suggests, we look at the matter anew, as though it had come to the courts for the first time." (footnote and citation omitted)).

## FACTS

In light of the foregoing, the following relevant facts are drawn from materials submitted by the parties, and are either undisputed or described in the light most favorable to Respondents. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).[1] iPayment is an Independent Sales Organization ("ISO") that enables small and medium-sized merchants across the United States to accept credit card payments. (Docket No. 33 ("Jt. Stmt.") ¶ 1). 1st Americard was an ISO engaged in the same business in the Charlotte, North Carolina area. (*Id.* ¶ 3). Greg Grainger was 1st Americard's CEO and was responsible for the company's day-to-day operations. (*See* Docket No. 10 Ex. 4 ("Award") at 1; Second Dahill Decl.Ex. 1 ("Hearing Tr.") 148-49). Kelly Grainger was the sole shareholder and President of 1st Americard. (Award 1).

In May 2013, the two companies entered into an asset purchase agreement pursuant to which iPayment paid nearly $5 million to 1st Americard in exchange for its merchant portfolio. (Jt. Stmt. ¶¶ 125-27). The parties also signed a "Sub-ISO agreement" that required 1st Americard to use its "best efforts" to recruit new merchants for iPayment for three years following the transaction. (Award 2).[2] The asset purchase agreement and the Sub-ISO

---

[1] The Court's prior Opinion, familiarity with which is assumed, contains an additional account of the events leading to these proceedings. *See iPayment,* 2016 WL 1544736, at *1-3.

[2] A "Sub-ISO" acts on behalf of an ISO by marketing the ISO's payment processing services to prospective merchants. (*See* Jt. Stmt. ¶ 5).

4

agreement each contained an arbitration provision. (*See* Second Dahill Decl. Exs. 5-6). Neither Greg nor Kelly Grainger, however, was party to the agreements in his or her individual capacity.

Shortly after 1st Americard wired payment to iPayment, things began to fall apart. On July 14, 2013, Greg Grainger (apparently — unbeknownst to iPayment — having been involuntarily committed) sent iPayment's general counsel a text message accusing Kelly Grainger of "kill[ing] all will to go forward with this deal." (Docket No. 7 ("First Dahill Decl.") Ex. 7; *id.* Ex. 9 ¶ 6). The text also stated that 1st Americard's portfolio had lost "at least 20%" of its value in the prior ninety days, that Kelly had "embezzled over 3 million dollars of the money," and that Kelly had tried to wire an additional "4 million dollars to an unknown" personal account. (*Id.*). iPayment immediately asked the Graingers to place the $4.87 million it had paid in escrow pending further discussion. (First Dahill Decl. Ex. 8). In response, the Graingers transferred the money into their personal bank accounts, leaving only $20,000 in 1st Americard's account. (Award 6).

Shortly thereafter, iPayment discovered that in the months leading up to execution of the asset purchase agreement, 1st Americard's portfolio had lost over 36% of its value and was generating only about $86,000 per month in revenue — approximately $50,000 per month less than what Greg Grainger had represented during the parties' negotiations. (*Compare* First Dahill Decl. Ex. 3, *with id.* Ex. 17, at 15-16). Additionally, by January 2014, 1st Americard's workforce had contracted from ten employees to three, leaving only the Graingers and a third employee who left in May 2014. (First Dahill Decl. Ex. 12 at 105; *id.* Ex. 16 at 18, 106). Between the closing of the sale to iPayment and the filing of this suit, 1st Americard had recruited only one new merchant for iPayment's portfolio. (First Dahill Decl. Ex 13, at 23-24).

5

In November 2013, iPayment initiated arbitration against 1st Americard and the Graingers, alleging breach of contract and other claims. (First Dahill Decl. Ex. 9). iPayment contended that the Graingers, although not signatories to the companies' agreements, were liable as 1st Americard's alter egos. (*Id.*). On March 31, 2015, after a four-day arbitration hearing, the arbitrator issued a Final Award (the "Award") finding that Respondents had breached the parties' agreements and that the Graingers were "proper parties" to the action because iPayment had sustained its burden of proof to pierce 1st Americard's corporate veil. (Award 2-6). The arbitrator found Respondents jointly and severally liable for $1,930,073.35 in damages, plus 9% per annum interest, and $420,191.39 in fees and costs. (*Id*. at 8). On February 13, 2015, iPayment filed a petition to confirm the Award in New York state court. (First Dahill Decl. Ex. 22). Thereafter, Respondents removed the matter to this Court and moved to vacate the Award as to the Graingers individually. (Docket Nos. 1, 3). On March 25, 2016, Judge Torres confirmed the Award as to 1st Americard, but deferred determination of whether to confirm it as to the Graingers pending further briefing on whether the evidence supported piercing the veil and holding the Graingers accountable for 1st Americard's breaches. *See* 2016 WL 1544736, at *5.

## DISCUSSION

Under New York law — which the parties agree applies here (Pet'r Mem. 30; Resp't Opp'n 10) — a plaintiff may "pierce the corporate veil" and sue a non-signatory for breach of contract when the non-signatory is an alter ego of a signatory. *Kaliner v. Mt. Vernon Monetary Mgmt. Corp.*, No. 07-CV-4643 (LMM), 2008 WL 4127767, at *2 (S.D.N.Y. Sept. 3, 2008). In order to pierce the corporate veil, a party must establish that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's

6

injury." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,* 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004); *see also Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1052 (2d Cir. 1997). The inquiry is a fact-specific one; there are no bright-line rules. *See, e.g.*, *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC,* 268 F.3d 58, 63 (2d Cir. 2001).

At the first step of the inquiry, New York courts consider ten factors in deciding whether the requisite degree of domination is present:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). A plaintiff need not "demonstrate that all of the *Passalacqua* factors apply to support a finding that defendant dominated the corporation. '[T]here is no set rule as to how many . . . factors must be present in order to pierce the corporate veil.'" *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F. Supp. 2d 308, 319 (E.D.N.Y. 2010) (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d. Cir. 1989)).

Applying the so-called *Passalacqua* factors here, there is more than enough evidence to conclude that the Graingers "exercised complete domination" of 1st Americard "in respect to the transaction attacked." *JSC*, 306 F. Supp. 2d at 485. In fact, the Graingers do not even dispute iPayment's arguments with respect to the third, fourth, fifth, sixth, and eighth factors, and wisely so. For example, with respect to the third factor, the evidence shows that the Graingers

7

repeatedly used 1st Americard's funds for their own benefit.  In response to iPayment's demand that they place the purchase money in escrow, they transferred the money into their personal bank accounts, leaving only $20,000 in 1st Americard's account.  (Award 6).  And in the two years following these transfers of funds, Kelly Grainger purchased a yacht for $330,789, a home for one of her daughters, and an "investment property" for another daughter.  (Grainger NC Hearing Tr. 54-55, 57-58, 201-203).  Notably, by her own admission, Kelly Grainger believed that her personal debts and 1st Americard's debts were "one in the same."  (Grainger NC Hearing Tr. 200).  As for the fourth, fifth, and eighth *Passalacqua* factors, 1st Americard shared ownership, officers, personnel, office space, a telephone number, and even funds with Universal Finance & Leasing, another corporation controlled by the Grainers.  (Jt. Stmt. ¶¶ 63-66, 69, 72, 74, 75, 76).  And the sixth factor is satisfied because the evidence demonstrates that the Graingers exercised unbridled discretion over 1st Americard's business.  (*See* Pet'r Mem. 42-44).  Indeed, Respondents themselves conceded in post-arbitration briefing that "[i]t would be a waste of . . . time to suggest that Greg Grainger did not dictate direction for 1st Americard . . . [or] to argue that Greg Grainger did not oversee nearly every aspect of 1st Americard." (Second Dahill Decl. Ex. 55, § 4).  Those five undisputed factors are, alone, enough to find that step one of the alter-ego inquiry cuts in iPayment's favor.

In any event, the two factors that Respondents do dispute also cut in favor of iPayment. First, 1st Americard lacked many of the formalities and paraphernalia of corporate existence, including by-laws, board meetings, corporate minutes and resolutions, and the keeping of complete and accurate official corporate records.  (*See* Jt. Stmt. ¶¶ 38, 40, 41, 42).  In fact, Kelly Grainger, the company's sole shareholder and President, had no idea whether the organization was formed as a corporation or a limited liability company, let alone whether the company ever

had a board of directors.  (Hearing Tr. 661-64).  Moreover, in both 2005 and 2015, the North Carolina Secretary of State administratively dissolved 1st Americard for failure to file annual reports.  (Jt. Stmt. ¶¶ 33, 177).  Such involuntary dissolution weighs in favor of finding lack of proper attention to corporate formalities at the company.  *See JSC*, 386 F. Supp. 2d at 473.

In arguing that the first *Passalacqua* factor does not weigh in favor of piercing the veil, the Graingers cite the fact that 1st Americard was a closely held corporation.  (Resp't Opp'n 12).  It is true that a court "must avoid an over-rigid preoccupation with questions of structure" when dealing with privately held corporations.  *Tycoons Worldwide Grp. (Thailand) Pub. Co. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 205 (S.D.N.Y. 2010).  But the absence of nearly *any* corporate formalities here crosses the line even for a closely held entity.  *See, e.g.*, *JSC,* 386 F. Supp. 2d at 473 (piercing the veil of a closely held corporation after finding an absence of corporate formalities, among other deficiencies).  That absence was vividly displayed in the iPayment transaction itself.  *See United States v. Afram Lines (Int'l), Inc.*, No. 91-CV-0898 (RLC), 1997 WL 423063, at *2 (S.D.N.Y. July 29, 1997) (piercing the corporate veil after finding, among other things, that the owner conducted "major transactions without the appropriate corporate approval").  Although Greg Grainger returned a signed form allegedly indicating that the 1st Americard board had approved the transaction, there was no board meeting at which such consent was given.  (Hearing Tr. 689-90).  Additionally, Kelly Grainger admitted that she played no part in reviewing or approving the transaction, even though she was the company's sole shareholder and President and it represented "a sale of over 95% of 1st Americard's business."  (*Id.*; *see also* Resp't Opp'n 16).

Turning to the second *Passalacqua* factor, there is ample evidence that the Grainger's left 1st Americard undercapitalized.  Indeed, immediately after the transaction with iPayment, the

Graingers transferred all of the nearly $5 million that 1st Americard had received from the sale out of a company bank account and into personal accounts, leaving the company unable to meet its contractual obligations to continue its business operations as iPayment's Sub-ISO.  (Jt. Stmt. ¶ 147).  And although Respondents claim that "there was no correlation to the withdrawal of the sale proceeds to the Grainger's personal accounts and the capitalization of 1st Americard" (Resp't Opp'n 17), the company's operating accounts indisputably lacked enough money for the company to operate.  In fact, by July 2014, 1st Americard had only two remaining employees, Kelly and Greg Grainger, down from the seven or eight people the company had on its payroll at the time of the iPayment sale in June 2013.  (Jt. Stmt. ¶¶ 32, 170).  Even 1st Americard's own accountant noted that the company had "no income coming in but did have expenses."  (Second Dahill Decl. Ex. 49).  And notably, by Kelly Grainger's own account, she had to transfer money from her personal accounts back into 1st Americard's account to cover its operating expenses on several occasions.  (Grainger NC Hearing Tr. 151, 179).

      In short, seven of the *Passalacqua* factors weigh in iPayment's favor, easily satisfying its burden at the first prong of the alter-ego test.  The evidence is also plain that the Graingers' domination of 1st Americard was used to commit "a fraud or wrong" against iPayment, satisfying the second prong of the test.  *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997).  Notably, a plaintiff is "not required to . . . prove actual fraud in order to pierce the corporate defendant's corporate veil, but must prove only that the individual defendant's control of the corporate defendant was used to perpetrate a wrongful or unjust act toward plaintiff."  *Yves Saint Laurent Parfums, S.A. v. Costco Wholesaler Corp.*, No. 07-CV-3214 (HBP), 2010 WL 2593671, at *5 (S.D.N.Y. June 24, 2010) (brackets omitted).  Moreover, "[u]nder New York law, the diversion of funds to make a corporation judgment-proof constitutes

a wrong for the purposes of determining whether the corporate veil should be pierced." *Capital Distrib. Servs.*, 2007 WL 1288046, at *3; *accord Feitshans v. Kahn*, No. 06-CV-2125 (SAS), 2007 WL 2438411, at *5 (S.D.N.Y. Aug. 24, 2007) ("Proof of a stripping of the assets of . . . an entity by its shareholders, which is motivated by a desire to render the . . . entity judgment proof, constitutes a fraud or wrong in satisfaction of the second prong." (brackets and internal quotation marks omitted)).

Here, there is no question that by transferring the proceeds of the iPayment sale to their private accounts and leaving 1st Americard's operating accounts undercapitalized, the Graingers sought to make the corporation judgment-proof. *See Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F. Supp. 2d 308, 319–20 (E.D.N.Y. 2010) ("There can be no question that defendant's dissipation of Olympia's assets served to remove them from the reach of Olympia's creditors, which constitutes a wrong against plaintiff."); *JSC*, 386 F. Supp. 2d at 475 (holding that "diverting payments from [the corporation] into personal accounts," which resulted in the defendant being "unable to comply with its contractual obligations" constituted a wrong for veil-piercing purposes). *Weinreich v. Sandhaus,* 850 F. Supp. 1169, 1179 (S.D.N.Y. 1994) ("Carrying on a business without substantial capital and leaving the corporation without substantial assets to meets its debts can justify piercing the corporate veil."). Additionally, by depleting 1st Americard of its operating funds, the Graingers knowingly left the company incapable of meeting its ongoing obligations under the Sub-ISO agreement.

In sum, the evidence, even when construed in Respondents' favor, plainly supports the arbitrator's decision to treat the Graingers as 1st Americard's alter egos and to impose the Award on all three jointly and severally. As Respondents proffer no other basis to challenge the Award, it follows that the Award must be and is confirmed with respect to all three Respondents. *See,*

*e.g.*, *CF Glob. Trading, LLC v. Wassenaar*, No. 13-CV-766 (KPF), 2013 WL 5538659, at *10 (S.D.N.Y. Oct. 8, 2013) ("[T]he [Federal Arbitration Act] requires that, if the parties agreed that a judgment may be entered upon an arbitration award, a court must enter an order confirming the arbitration award unless one of the statutorily specified grounds for vacatur is found to exist.").

One issue remains: iPayment's request for attorney's fees in connection with this confirmation proceeding. (Pet'r Mem. 59-60). That request is unopposed, and for good reason: In the asset purchase agreement, 1st Americard agreed to "indemnify . . . [iPayment] from and against all . . . reasonable attorneys' . . . fees. . . arising out of, or incident to . . . any material breach or failure by [1st Americard] to perform or fulfill any of its covenants or agreements." (Second Dahill Decl. Ex. 31, § 6.1). As this action arises out of 1st Americard's material breaches of, and failure to perform under, the parties' agreement, iPayment is plainly entitled to reasonable attorneys' fees. *See, e.g.*, *N.Y.C. Dist. Council of Carpenters Pension Fund v. Dafna Constr. Co., Inc.*, 438 F. Supp. 2d 238, 242 (S.D.N.Y. 2006) ("Since the parties bargained for the awarding of attorneys' fees in this precise circumstance, the Court respects their agreement and orders [the defendant] to pay the costs incurred by the Trustees in seeking confirmation of the arbitrator's award."). Counsel shall confer in an effort to reach agreement on what constitutes "reasonable" fees. Barring agreement, iPayment shall submit a fee application, supported by contemporaneous billing records, no later than **thirty days** from this Opinion and Order; Respondents shall file any opposition within **two weeks** of any application. Absent leave of Court, iPayment may not file a reply.

## CONCLUSION

For the reasons stated above, iPayment's petition to confirm the arbitration Award is GRANTED as to all Respondents, iPayment's request for attorney's fees is GRANTED, and Respondents' motion to vacate the award in part is DENIED.

The Clerk of Court is directed to terminate Docket Nos. 5 and 10.

SO ORDERED.

Date: February 23, 2017
New York, New York

JESSE M. FURMAN
United States District Judge